Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Richard Seeborg, Judge

```
Gametek LLC,                    )
                                )
            Plaintiff,          )
                                )
   VS.                          )   NOS. C 13-02546 RS
                                )         C 13-03089 RS
Zynga, Inc., et al.             )         C 13-03472 RS
                                )         C 13-03493 RS
            Defendants.         )
_____ )
```

San Francisco, California
Thursday, April 24, 2014

**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:

For Plaintiff:

              CEPIP
              1616 South Voss Road, Suite 125
              Houston, Texas 77057
      BY: **JOHN EDMONDS, ESQ.**


For Defendants Zynga
and Electronic Arts:      GIBSON, DUNN & CRUTCHER
              333 South Grand Avenue
              Los Angeles, California 90071
      BY: **WAYNE BARSKY, ESQ.**
           **ELLEN LIN, ESQ.**


For Defendants Funzio
and Crowdstar:            KILPATRICK, TOWNSEND & STOCKTON LLP
              Two Embarcadero Center, 8th Floor
              San Francisco, California 94111
      BY: **STEVEN D. MOORE, ESQ.**


Reported By:         James C. Pence, RMR, CRR, CSR No. 13059
                  Official Court Reporter

| | |
|---|---|
| 1 | **Thursday - April 24, 2014**                                        **1:32 p.m.** |

2                       **P R O C E E D I N G S**

3                           **---oOo---**

4          **THE CLERK:**  C 13-2546, Gametek versus Zynga and all

5   related matters.

6       Counsel, please state your appearances.

7          **MR. EDMONDS:**  Good afternoon, Your Honor.  John

8   Edmonds here on behalf of plaintiff Gametek.

9          **THE COURT:**  Good afternoon.

10         **MR. BARSKY:**  Good afternoon, Your Honor.  Wayne Barsky

11  with Ellen Lin, L-i-n, Gibson Dunn, on behalf of Electronic

12  Arts and Zynga.

13         **THE COURT:**  Good afternoon.

14         **MR. MOORE:**  Good afternoon, Your Honor.  Steve Moore

15  with Kilpatrick Townsend on behalf of the Crowdstar and Funzio

16  defendants.

17         **THE COURT:**  Good afternoon.

18         **MR. MOORE:**  Thank you.

19         **THE COURT:**  This matter is on the calendar for a

20  motion for judgment on the pleadings under Rule 12(c).  While

21  the motion papers are -- have some differences, essentially

22  it's a similar motion brought by the four defendants at least

23  as I understand it.

24         **MR. BARSKY:**  Yes, sir.

25         **THE COURT:**  The question here -- the big question is

1  whether or not the '455 patent is invalid for non-patentable

2  subject matter, whether or not there's an abstract idea that

3  doesn't rise to the level of patentable, or is it the

4  application of that abstract idea which theoretically could be

5  subject to the issuance of a patent.

6      I recognize the presumption in favor of patent validity.

7  I know that that is an important principle, and I also

8  recognize the high bar that the defendants have to transcend in

9  the form of the clear and convincing standard, and I also

10 recognize, as *Ultramercial* says, it's certainly not typical to

11 decide a question on judgment on the pleadings under Section

12 101, but I think it's appropriate here.

13     From the review of the papers that I've done, it simply

14 doesn't appear to me that the '455 patent advances anything

15 beyond a non-patentable abstract idea.  So we can go into

16 obviously all the factors, but that's -- I think you're

17 entitled to know my tentative view, having spent some time with

18 the papers.

19     So in light of that tentative, I'll look to you first, Mr.

20 Edmonds, to begin the discussion.

21         **MR. EDMONDS:**  Thank you, Your Honor.

22     The -- pardon me.  The '455 patent, in particular Claims

23 15- -- or -- well, the '455 patent -- they really discuss Claim

24 1, but there have been some assertions about --

25         **THE COURT:**  Well, 15 and 7 -- 15 and 17 -- you

1  indicate in your papers that you think there are some

2  distinctions that are of consequence to this question, but then

3  I didn't see why in your papers.

4      MR. EDMONDS:  They are -- 15 and 17 are narrower in

5  the respect that they don't have the demographic information

6  limitation.  In any event, I was just saying when we talk about

7  a patent, obviously we have to talk about what is claimed.

8      THE COURT:  Right.

9      MR. EDMONDS:  So to start with, the -- what's claimed

10  by the '455 patent is, as we see it, a technological

11  improvement in computer gaming, in particular video gaming.  It

12  has specific implementations of a program computer.  It's not

13  merely an abstract idea.  It's, if anything -- the defendants

14  have asserted that you have to find an abstract idea somewhere

15  in the claims.

16    We don't read the case law that way, but if -- to the

17  extent the Court has found there's an abstract idea, this would

18  be an application of that idea, not the abstract idea itself.

19  Abstract ideas themselves -- abstract ideas, if you look to the

20  guidance provided by the Patent Office, for example, in the

21  Manual of Patent Examining Procedure, are things like business

22  methods like a method of hedging risk like, for example, human

23  relations.

24    And if you look to the case law where claims have been

25  invalidated under 101 as an abstract idea, that is the

1   predominant theme.

2         **THE COURT:**  Well, hedging risk is *Prometheus* --

3   *Prometheus* case, I believe, isn't it?  Or it's *Pilski*.  *Pilski*

4   is the --

5         **MR. EDMONDS:**  *Bilski*.

6         **THE COURT:**  *Bilski* is the hedging risk.

7      How is this idea really different than that kind of idea?

8   I mean, you're talking -- the idea as I understand it is the

9   concept that while play is underway, you are able to buy object

10  items -- you, the player -- without disrupting the play.  Is

11  that fair?

12        **MR. EDMONDS:**  Well, there's a whole dispute in this

13  case over what "interrupting" means.  So I hate to use words --

14  I hate to substitute something for "interrupting."

15        **THE COURT:**  Well -- and we haven't -- I haven't

16  construed the claims, and I take your construction for purposes

17  of this -- this motion, although I don't think -- the only

18  issue -- the only claim term that indicates -- indicated to me

19  that needs to be construed doesn't really go to this question,

20  but go ahead.

21        **MR. EDMONDS:**  The -- I think the case that provides

22  better guidance for the Court is *Ultramercial*, and *Ultramercial*

23  warns against taking a claim, oversimplifying it, and trying

24  to -- when you -- as some judges have said, if you try to go

25  looking for an abstraction, you will tend to find one.

1    In *Ultramercial*, the claims had to do with a method of

2  improved banner ads where you would offer some kind of

3  copyrighted material to someone, and if they look at the

4  advertisement, the advertisement will pay for the copyrighted

5  material.

6    And the way that was looked at by Judge -- by Judges Rader

7  and Lourie, who have somewhat different approaches under

8  *Bilski* -- the way -- that claim was found valid by both, and it

9  was looked at -- looking at all the real limitations of the

10  claim.

11    Now, we've mapped out 12 different -- what -- I mean,

12  there are lots of limitations in the claim, but really 12

13  different steps as to Claim 1 that would be looked at.  So --

14    **THE COURT:**  But, you know, that -- in your papers, you

15  talk often about "We have 12 steps, 12 steps," but the number

16  doesn't mean anything.  That's not of any particular

17  consequence.

18    In the steps themselves, it appears to me you're simply

19  breaking down some obvious points along the path of -- of

20  purchase.  I mean, it doesn't -- you don't get anywhere just by

21  parsing them out and putting -- putting different numbers next

22  to them.

23    So I didn't -- I know in your papers you keep talking

24  about, "Well, this is" -- "this shows how involved and specific

25  this process is," but it's really not a whole lot there.  It's

1   all just kind of the standard course of a purchase.

2        **MR. EDMONDS:**  Well, we respectfully disagree,

3   Your Honor, and I think that they -- it flows into the task for

4   *Mayo* and where -- whether they focus on preemption, and you --

5   if you've identified what the Court believes is an abstract

6   idea, you basically use the language that the defendants have

7   used.

8        If you identify that as the abstract idea and believe

9   that's the abstract idea, then you look to see whether it would

10  preempt all applications of that abstract idea, whether they're

11  meaningful limitations --

12        **THE COURT:**  Right.

13        **MR. EDMONDS:**  -- or differentiated.

14  So if you took the -- and said, "Okay.  Well, the abstract

15  idea is" -- I think the Court's interpreted it as saying

16  acquiring objects -- purchasing objects in a game without

17  interrupting it, and then you'd say, "Well, does it preempt all

18  applications of that?"  No, it doesn't.  That's why you need to

19  look at these other limitations in the claim.

20        In the first instance, the gaming action is controlled by

21  a computer.  So if you don't have the entire thing -- if it's

22  not controlled by a computer, then it's -- you haven't

23  preempted that.  You haven't preempted the tracking activity

24  limitation, which is a significant limitation, and that's

25  not -- that's not just pre-solution activity.

1    You could offer objects in a game without making them --

2    that offer dependent upon the tracked activity, and because you

3    can do that, there's no way you can say that it preempts that,

4    and so you'd have to say that tracked activity is just simply

5    something that's inherent or in making an offer to someone, but

6    it's not.

7    You could, for example, just offer everything to them.

8    You can say our -- like I walk into Wal-Mart.  Everything is

9    for sale in Wal-Mart.  There's no tracked activity limitation

10   on what I purchase at Wal-Mart.  In this application, though,

11   that -- the offer to purchase the game is -- or the object is

12   limited in part by the tracked activity of the user.  So you

13   can't say that's preempted, and I don't think you can say that

14   that's just inherent in making an offer because it's not.

15   In addition, you have -- you have -- it's a video game

16   because it's something that has to be -- it's controlled by a

17   computer.  You have to have something displayed in a computer,

18   and that's not something that is inherent, either.

19        **THE COURT:**  Is the '455 patent limited to video games?

20        **MR. EDMONDS:**  I think that the -- yeah.  So as

21   claimed, yes.  Yes.  I think that the distinction where the

22   defendants have somewhat taken the Court astray is the '455

23   patent has a significant amount of unclaimed subject matter

24   where the patentee was talking about just gaming in general, an

25   advantage in life like in Traffic Court or something like that.

1    He tried to get claims on that and wasn't able to.

2        So as the claims were narrowed over the course of years

3    and over the course of all these different office actions, it

4    was limited to a game, and now you have a game that's

5    controlled by a computer, and you have something where the

6    price is displayed, and then the object is incorporated into

7    the game.

8        You can certainly have a game where you don't incorporate

9    the game object into the game; for example, the prior art that

10    was cited.  I think for the Court, what would be informative to

11    the Court -- and it's one of the exhibits -- is the notice of

12    allowance for these claims in which the Examiner goes through

13    the prior art and talks about differences between these claims

14    and the prior art.

15        If these claims preempted an abstract concept of making a

16    purchase in a game without interrupting, it wouldn't have been

17    allowed over the prior art.  So -- and that's -- that's the

18    note -- the notice of allowance.  It's one of the exhibits

19    to -- to our -- to our response.

20        So I think where -- when the Court -- if you identify the

21    abstract idea like that, then you have to say, "Does it

22    preempt?"  No, it just simply does not.  There are many ways to

23    play a game without -- without running afoul of the abstract

24    ideas the Court has identified.  There are many ways to play an

25    electronic game without preempting the abstract ideas the Court

1    has identified.

2        And unless you can make that leap and say that either it's

3    not preempted or those are just meaningless limitations near

4    pre-solution activity, then the claims must be held valid.

5        **THE COURT:**  Can you talk to me for a moment about --

6    you point to in the preamble the reference to use of a program

7    computer.  You seem to think that's significant and -- but when

8    I've looked at the case law -- and you're saying it's different

9    than the case law that has essentially said just throwing in

10   "Use a computer to do this" doesn't add anything.

11       But you said, "Well, our situation is different than in

12   those cases," but I don't understand why because all it says is

13   "use of a program computer," and there's nothing about, you

14   know, utilizing an algorithm or something that says anything

15   beyond "You can do this with a computer" --

16       **MR. EDMONDS:**  Well --

17       **THE COURT:**  -- "if you want to."

18       **MR. EDMONDS:**  -- an algorithm certainly isn't

19   required.  In fact, in the *Diehr* case --

20       **THE COURT:**  No.  No.  I use that by way of example.

21       **MR. EDMONDS:**  Right.  So -- yeah.  I mean, the case

22   law says if I just have a claim and I had a computer and say,

23   "Apply it," then that's not enough --

24       **THE COURT:**  Right.

25       **MR. EDMONDS:**  -- or just having the word "computer" in

1    there is not enough.  Here, the difference is that -- or some

2    of the differences are:

3        1.  A computer is necessary to effectuating the invention

4    as claimed.  It's necessary for the efficacy of the invention.

5            **THE COURT:**  How do I know that?

6        **MR. EDMONDS:**  Well, because you look at the claim

7    and -- for example, a program computer affects the step of

8    controlling the gaming action.  There's -- you can't --

9            **THE COURT:**  If I look at all the rest of the -- of

10   what's claimed and that could be done simply by a person with a

11   pad and a pencil -- it may take longer -- why can't you just

12   say, "Well, the fact that we threw in the word 'computer'" --

13   "therefore, that's" -- "that's a limitation that reflects that

14   it can only be" -- "it can only be performed with a computer"?

15   You can't just -- just putting the word "computer" in there

16   doesn't -- doesn't achieve that.

17       **MR. EDMONDS:**  A person with a pen or in their head

18   could keep track of an account given -- a person in their head

19   or with their hand could track an activity of someone in a

20   game.  What we're focusing on is that this is actually

21   controlling the gaming action for a user.  A computer is

22   required to do that.  A human can't control someone else's

23   gaming action.  You can't do that with pen or paper.

24       In addition, the displaying step -- you're displaying

25   something in a game environment.  That requires a computer.  In

1    addition, these without-interrupting steps -- that's something

2    that requires a computer because it's a realtime transaction.

3    And lastly, incorporating the game object into the game -- that

4    really has to do with what in today's parlance we call virtual

5    goods, but it's something -- it's actually incorporated into

6    the game, and it takes a computerized game to do that.

7         So that's something that's also -- a computer is required,

8    and those are things that in part differentiate this from cases

9    where -- or from things where they said -- and I guess what a

10   lot of those -- those things is you'd have, you know, hedging

11   or trading activities and -- that have been done for a very

12   long time, and somebody said, "Let's do it with a computer.  We

13   can speed it up."

14        And courts have said, "That's not good enough.  You just

15   had a computer apply it."  This is an area in the -- there are

16   lots of patents in the gaming area.  There are lots of patents

17   in the video gaming area.  This isn't just some area where, as

18   we got computers, we said, "Oh, let's just speed it up."

19        I think that an adverse ruling here, I think, would be --

20   if upheld, would be damaging in the field of gaming because

21   there are lots of patents, and if you took almost any game and

22   you tried to reduce it to an abstract idea, I think you could

23   possibly do that, and you can go down this same path, and I

24   don't think that that's a proper analysis.

25        With respect to --

1       **THE COURT:**  Well, let me just stop you there.

2       **MR. EDMONDS:**  Yeah.

3       **THE COURT:**  You may be right on the effect of the

4   decision once -- if it's upheld or what have you, but why is

5   that necessarily wrong?  I mean, I don't understand -- your

6   parade of horribles is "Oh, there's some patents out there

7   that" -- you know, "There are plenty of patents in this area."

8   That -- that may be a fact, but that doesn't mean that

9   therefore we say, "Oh, can't go there because there are plenty

10   of patents out there."

11       **MR. EDMONDS:**  The distinction I was inartfully trying

12   to make is that -- and the courts have made a distinction -- is

13   whether you have an area where it's a traditional area of

14   technology, an area where people have traditionally gotten

15   patents, and electronic gaming and video gaming fall under that

16   qualification.

17       It's not -- it's not trading commodities.  It's not --

18   it's not hedging risk or things like that, and I think that's

19   the difference I was trying to make, and I think that plays

20   into the comment I just made in the sense that a computer is

21   necessary to effectuate this computerized gaming invention

22   because there are steps that can't be performed by hand and

23   head, as we've set forth, and I think if the Court's not --

24       **THE COURT:**  Well, let me stop you there.

25       **MR. EDMONDS:**  Yeah.

1          **THE COURT:**  What are those steps?  I mean, I

2    understand that it makes -- it's a lot easier to use a

3    computer.  I understand that, and there's speed issues and

4    other things, but what are the steps that you say could only be

5    performed by a computer?

6          **MR. EDMONDS:**  All right.  In the first instance, the

7    computer controls the gaming action for the users.  That just

8    doesn't -- that doesn't happen outside the context of a

9    computer.  Even a referee who's refereeing a game on a field

10   doesn't control the gaming action.  He just -- he or she just

11   referees the gaming action.  So that -- that's --

12         **THE COURT:**  So I guess I'm not entirely -- I don't

13   entirely even understand that.  It's that the controls -- the

14   game -- are you saying anything other than the games are run on

15   a computer?  I mean, I'm not sure what you're saying in terms

16   of saying "controlling the gaming action."

17         **MR. EDMONDS:**  I'm saying that this -- that the games

18   for these claims --

19         **THE COURT:**  Right.

20         **MR. EDMONDS:**  -- can only be played on a computer.  If

21   I'm not on a computer, if it's not a computerized game --

22         **THE COURT:**  Right.

23         **MR. EDMONDS:**  -- computer game, then it's not

24   controlled --

25         **THE COURT:**  Okay.

1          **MR. EDMONDS:**  -- by a computer.  So it's limited to a

2    specific application of games, and a computer is necessary to

3    effect that.

4          **THE COURT:**  Okay.  So with respect to the specific

5    steps, tell me which ones can only be controlled by -- or can

6    only be computer-programmed.

7          **MR. EDMONDS:**  Right.  So -- and maybe we're talking --

8    on the controlling, what I'm saying is the computer controls

9    game play.

10          **THE COURT:**  I understand that point --

11          **MR. EDMONDS:**  Okay.  Yeah.

12          **THE COURT:**  -- but then you also were saying --

13          **MR. EDMONDS:**  Right.

14          **THE COURT:**  -- that the steps you delineated can only

15    be performed by a computer.

16          **MR. EDMONDS:**  Right.  So in only a computerized game

17    could you display in the game environment the purchase price

18    for the game object.  A computer is required to do that because

19    the game environment is -- you can only have a game environment

20    in an electronic or video game like this.

21          In addition, the without-interrupting steps where you have

22    that offer to purchase without interrupting the gaming action

23    and supplying without interrupting the gaming action can only

24    be done realtime.  As the patent describes it, the reason you

25    set up these accounts is so you don't have the interruption

1   that would be typical with processing in the prior art.  So you

2   can't have a realtime transaction like that without having --

3   without a computerized game here.  It's necessary to do that.

4       And then lastly, incorporating the game object into the

5   game -- only -- only a video game -- a computerized game is

6   capable of doing that.  It's necessary to do that.  Those are

7   the elements that cannot be done by hand.  They can't be done

8   in someone's head.  They have to be effectuated by a computer,

9   or the claim itself is not effectuated.

10          **THE COURT:**  Going back for a moment -- I know you say

11  that the wrong way to look at this is to -- is to rely upon

12  what is identified as the abstract idea, but let's assume that

13  there is this abstract idea that's reflected in the '455

14  patent.

15      And so going from that analysis point, what is -- how

16  would you characterize the inventive concept that this patent

17  adds to that idea?  What is it if you were to characterize it?

18          **MR. EDMONDS:**  Well, yeah.  I don't -- and I think

19  that's where *Ultramercial* is instructive in that they talk --

20  the opinion goes through the various steps of the claims and

21  looks at it in its totality.  So I don't know.  That's why when

22  we laid out the 12 steps --

23          **THE COURT:**  What I'm asking you --

24          **MR. EDMONDS:**  Yeah.

25          **THE COURT:**  -- is I want you to tell me in whatever

1  words you think are appropriate what is the inventive concept

2  here.  What is it?

3        MR. EDMONDS:  Well, the inventive concept is the

4  totality of the claim and what distinguishes over the prior

5  art, and I don't know a better way to articulate that than to

6  go through the 12 steps that are on Page 2 of our brief.

7        THE COURT:  Well -- so the inventive concept is the 12

8  steps?

9        MR. EDMONDS:  It is the totality of those 12 steps --

10        THE COURT:  Okay.

11        MR. EDMONDS:  -- just like in *Ultramercial*.  I think

12  when you try to pick apart a claim and say -- and then frankly,

13  the analysis starts to delve into where you're really

14  looking -- you're delving into more of a 103 analysis when

15  you're saying that "Identify to me one element of this claim

16  that's so novel it distinguishes it from all prior art."

17        THE COURT:  But don't you think if your -- even if

18  your basic answer is the inventive concept is represented by

19  these 12 steps, don't you think you should be able to then

20  provide a characterization of what those 12 steps result in?

21        MR. EDMONDS:  Well --

22        THE COURT:  In other words, I'm not disputing that

23  you -- your premise that you have to look at this holistically,

24  and that's -- I don't have a problem with that notion, but I do

25  think that you can both point to the 12 steps and then tell me

 1    why those 12 steps represent some inventive concept.

 2        And so I don't disagree with your construct, but I still

 3    would like to have some characterization from you as to what

 4    those 12 steps all amount to.

 5            MR. EDMONDS:  Well, one thing I'd refer the Court is

 6    the comments of the Examiner himself who allowed the claims --

 7            THE COURT:  Okay.  Go ahead.

 8            MR. EDMONDS:  -- a neutral observer, if you will, who

 9    said, "The instant invention is distinguished from the prior

10    art singly or in combination as the system tracks a user's

11    gaming actions, the system determines whether a user is

12    eligible to purchase a game object based on the user's account

13    balance, the system presents an offer to the user to

14    purchase..." and keeps saying "the system" because it's a

15    computer system doing it.

16        "The system" -- and that's his words.  "The system

17    presents an offer to the user to purchase the game object based

18    at least on tracked gaming action or game activity, the user

19    purchases and is supplied with the game object without

20    interrupting the gaming action, and the object is incorporated

21    into the game."  That's a narrative way --

22            THE COURT:  Okay.

23            MR. EDMONDS:  -- of saying it.

24            THE COURT:  Most of those steps are pretty mechanical

25    data retrieval and then data organization.  There is no -- and

1    I agree with you that it doesn't have to be an algorithm, and

2    I'm not suggesting that it does, but there's nothing

3    particularly significant about the computer in those steps.

4        I mean, you know, determining whether or not there's an

5    account balance that would be sufficient for the game player to

6    purchase a game item is -- is a purely mathematical process

7    that a human being could do, and -- in some of the other steps

8    as well.

9        I hear your point that sort of doing this

10   synergistically -- it makes much more sense and indeed in your

11   position can only be done on a computer, but the actual steps

12   that the computer has embarked upon are really nothing but data

13   collection and organization from what I can see.

14       **MR. EDMONDS:**  Well, I respectfully disagree, and I

15   think the Court has focused on the account, which I think is --

16   we're not claiming the account is the -- you asked for the

17   claim of novelty, if you will, and I've already said that

18   somebody could keep an account in their head, and I understand

19   that an account is something that would go along with a

20   purchase.  That's fair enough.

21       But I think the things to look at are the things that I

22   was focusing on, which is that you're controlling the game.

23   You're controlling the entire game.  You're tracking activity

24   in the game.  As I mentioned, this doesn't preempt selling game

25   objects.  The tracked activity limitation is a limitation that

1   distinguishes over the prior art.

2        So, you know, I think just looking at the Examiner's

3   comments and looking at the prior art, if you say there's

4   nothing novel or nothing that's not pre-solution that's not

5   necessary and inherent in there, that is a point of novelty.

6        In addition, the fact that you incorporate the game object

7   into the game is something that just simply a lot of this prior

8   art just didn't do.  That's another point of novelty.  I mean,

9   I think there are a lot of things here where you can say you

10  can have a game where you sell things to someone and it

11  doesn't -- it doesn't interrupt the gaming action, and there's

12  still -- it still doesn't preempt that happening.  It takes

13  these further limitations.

14       In particular, I focus it on the tracked activity

15  limitation and the incorporating the game object into the game

16  and the fact that this is computer-controlled gaming.  The

17  entire game is controlled by the computer, but I don't see how

18  the Court can say that those are just insignificant activities

19  because the tracked activity is significant.  It's significant

20  in getting the claims alive with the prior art, and

21  incorporating the game object into the game is significant.  It

22  was significant in getting the claims alive over the prior art,

23  too.

24       I think that -- especially at this stage when there's no

25  evidence, I think at least the Court could look to the

1    Examiner's reasons for allowance, and that should be reason

2    alone to conclude that there are meaningful limitations here,

3    that this doesn't preempt all games or even all games as the

4    defendants have described the abstract idea.

5              **THE COURT:**  All right.  Who from the defense side

6    wants to start the process?

7              **MR. BARSKY:**  Thank you, Your Honor, Mr. Edmonds.

8         Your Honor, let me see if I can take a step back and put

9    this into context because a lot of what the Court just heard

10   proceeding -- proceeded on an assumption that I think is

11   mistaken, and that was the answer to the Court's question about

12   whether Claims 1, 15, and 17 are all directed to video games.

13        If we look at Claims 1, 15, and 17, we're going to find

14   that they are directly to the operational management of a game

15   by a computer, but the claims do not recite and are not limited

16   to games that are performed on a computer or where the gaming

17   environment is a computer.

18        And the best evidence of that, Your Honor, is Claim 2,

19   which is a dependent claim from Claim 1 and specifies that the

20   gaming environment comprises a video game, which means as a

21   matter of law that Claim 1, the independent claim here -- and

22   this is true of 15 and 17 as well -- include but are not

23   limited to video games.

24        We can also see that, Your Honor, in the specification of

25   the patent, which is replete with references to the fact that

1   the claimed invention is directed to non-computing, partial

2   computing, and interactive computing applications, and that can

3   be found throughout the specification of the '445 patent.  We

4   tried counting up the number of references to that just before

5   the hearing started.  We came up with the number ten.

6       It's included in the summary of the invention on Column 2

7   at Line -- I believe that's 50 to 55 -- I'm sorry -- 50 to 55,

8   where it talks about the present invention being directed to

9   providing systems and methods used to create, integrate, and

10  transact various advantages in non-computing, partial

11  computing, and interactive computing environments.

12          THE COURT:  And so --

13          MR. BARSKY:  So --

14          THE COURT:  -- the significance you draw from the fact

15  that you characterized these claims as not being confined to

16  the video game world -- what -- the significance of that is

17  what goes to the concept of preempting the field.  What is it?

18          MR. BARSKY:  Yes.  Thank you, Your Honor.

19          THE COURT:  Okay.

20          MR. BARSKY:  It goes directly to the comments that

21  were made by Mr. Edmonds about certain steps having to be

22  carried out by the computer because what we are talking about

23  is video games.  We heard that there were a number of steps

24  that, according to the plaintiff, must be carried out by the

25  computer because a person cannot control the action of a video

1  game, only the computer can do that, and there were similar

2  references to the steps of incorporating game objects into the

3  game in realtime.

4       **THE COURT:**  In fact, the specification has examples

5  which are not video examples.

6       **MR. BARSKY:**  Most definitely.

7       **THE COURT:**  Right.

8       **MR. BARSKY:**  What we -- we had in our moving papers,

9  Your Honor -- we gave an example of a charity golf

10 tournament --

11      **THE COURT:**  Right.

12      **MR. BARSKY:**  -- where mulligans were being sold to the

13 players.  We didn't come up with that out of our -- out of our

14 own fertile creativity.  That comes directly from the patent,

15 which refers to exactly the game of golf and the -- and the use

16 of mulligans to permit players to give advantages they might

17 not otherwise be entitled to.

18      So the other part of the significance, Your Honor, is that

19 it shows that each of these steps can also be carried out in

20 the real world by a person with -- as Your Honor mentioned and

21 as was referenced in the *Cybersource* decision in the Federal

22 Circuit, a person with a pad of paper and a pen.

23      Your Honor, if it would be helpful to the Court, I have

24 something I'd like to hand up and to Counsel.

25      **THE COURT:**  Is that true, though, with respect to all

1   of the steps?  I mean, there's some of the 12 steps that

2   contemplate a certain interactive aspect of the gaming

3   experience, and really, is it realistic to say that that could

4   be done in any fashion other than with a computer environment?

5   For example, alert, you know, the point at which the

6   opportunity to purchase while play is underway these game items

7   and all of that.

8       Can it realistically be practiced on anything but a

9   computer environment?

10      **MR. BARSKY:**  Sure, it can, Your Honor.  We give a

11  detailed example of that in our moving papers where we walk

12  through each of the 12 claim steps and talk about how a

13  tournament official at a golf tournament administering this

14  program of selling mulligans for charity might do so.

15      I thought Your Honor was going to say that not every one

16  of the 12 steps could be carried out in the human mind, and I

17  do agree with that because there are certain real-world

18  connections, if you will, of some of these steps such as

19  actually supplying the game object and having it incorporated

20  into the game in realtime.  That can't be carried out in the --

21  in the human mind.

22      But what the jurisprudence of the Federal Circuit and the

23  Supreme Court teach us is that the question becomes, as

24  Your Honor pointed out in the *Genetic Technologies* case, do

25  these additional limitations that go beyond the abstract idea

1    or perhaps the law of nature -- do they add something

2    meaningful to the claim such that it is fair to find that the

3    filter of Section 101 has been met?

4         And what we have argued in our papers, Your Honor, and

5    what our position is here is that there is nothing in here that

6    is meaningful that would add in any way to what is at its core

7    the recitation and abstract idea in these claims.

8         And Counsel referred to *Ultramercial*, and I completely

9    agree that there is a passage in *Ultramercial* that talks about

10   exactly what one might look for if one were to ask, for

11   example, does the computer in this case that is recited by the

12   claim add something meaningful.

13        And what the *Ultramercial* court talked about -- and, of

14   course, there's a surpetition pending there, but what the

15   *Ultramercial* court talked about was when there was a specific

16   way of doing something that was recited by the complaint -- by

17   the claim or whether a specific computer was required.

18        *Ultramercial* said -- and I just want to quote -- "Claims

19   directed to nothing more than the idea of doing that thing" --

20   that abstract idea -- "on a computer are likely to face larger

21   problems.  Meaningful limitations may include the computer

22   being part of the solution, being integral to the performance

23   of that method, or containing an improvement in computer

24   technology."

25        And one will look in vain in the specification of the '445

1    for any recitation of some improvement in computer technology

2    that, for example, allows game objects to be supplied to

3    players without interruption of the game.  There's no reference

4    to that at all.

5        So this case is distinguishable from *Ultramercial*, which

6    the courts have recognized disclosed a -- I believe the phrase

7    was a complex and sophisticated programming that was required

8    to carry out the inventions in that case, which involved

9    solving this problem of users just clicking out of banner ads

10   and going right to the media that they wanted to watch but

11   instead programming the computer so that you had to actually

12   navigate the banner ads and review the advertisement before you

13   can get to the media or the content that you wanted to review.

14       And so here there really is no inventive concept.  With

15   apologies to my colleague Mr. Edmonds, there is nothing here

16   that would take this out of the realm of simply a recitation of

17   an abstract idea.  I think --

18           **THE COURT:**  Can I take anything from -- I think I know

19   what you're going to say to this, but the fact that the -- that

20   it was a long process of back-and-forth in the PTO and there

21   was obviously significant scrutiny applied by the Patent

22   Examiner and it finally resulted in the issuance of the

23   patent -- can I take that into account?

24       In other words, not simply the patent issues.  We issue --

25   we all know that, and we all know there's a presumption of

1  validity, but the patent history here that was extended -- and

2  there was some particular focus on some of these concerns.

3          **MR. BARSKY:**  Yes, Your Honor.

4      I don't think there is anything that would preclude the

5  Court from taking that into account, but I would simply point

6  out that in the *Dealertrack* case, there was a nine-year file

7  history where the Federal Circuit found that the claims did not

8  pass the Section 101 muster.

9          In the *OIP Technologies* case in this court, Your Honor,

10  that case involved an 11-year file history.  That was, of

11  course, a motion to dismiss, ultimately affirmed that opinion

12  by the Federal Circuit.

13         And so the answer is yes, the Court can take that into

14  account, but no, I don't think that should change the calculus

15  at all for our purposes today.

16         **THE COURT:**  How about the preemptive field concept,

17  which Mr. Edmonds spent a good deal of time on --

18         **MR. BARSKY:**  Yes.

19         **THE COURT:**  -- and in the papers they focus on?  Why

20  don't you address that for me.

21         **MR. BARSKY:**  Sure.

22         That is one of the guideposts that the Supreme Court has

23  provided because what it has not provided -- and it's unclear

24  whether after *CLS Bank* it will provide real guidance to the

25  District Courts, but certainly one of the guideposts that's out

1   there that the Court could look to is the scope of preemption.

2        And we know for certain that complete preemption of the

3   field is not required, and we know that because, for example,

4   in *Bilski*, the claims were directed both to the basic concept

5   of hedging risks and price fluctuations -- and that was in the

6   independent claim -- as well as hedging risks and avoiding

7   price fluctuations in discrete segments of the economy, most

8   notably the energy sector, and neither of those claims -- none

9   of those claims passed Section 101 muster.

10       In *Dealertrack*, the claims were limited to the use of a

11  loan processing in the -- in the car loan market, if you will.

12  And in *Banc*- -- I'm sorry?  I'm sorry?

13            **THE COURT:**  No.  No.  I didn't say anything.

14            **MR. BARSKY:**  Oh.  I'm sorry.

15       And so in *Bancorp*, which is cited in our briefs, it

16  explicitly -- it explicitly -- the Federal Circuit explicitly

17  rejected the notion that you can salvage an otherwise

18  unpatentable abstract idea by limiting it to some segment of

19  the economy or some particular field or, highly relevant to

20  this case, adding insignificant limitations, what were

21  called -- what the courts called predictable pre-solution or

22  post-solution activities.

23       And so I don't think the fact that we are talking about

24  games in general or video games in particular -- and that's

25  only in some of the dependent claims -- should change the

1    result here any more than it changed the result in *Bilski* or

2    *Dealertrack*.

3         **THE COURT:**  Okay.  Thank you.

4    Mr. Moore, is there anything you want to add to your -- to

5    that --

6         **MR. MOORE:**  No, Your Honor.

7         **THE COURT:**  -- defense side?

8         **MR. MOORE:**  We join in Mr. Barsky's arguments in full.

9         **THE COURT:**  Mr. Edmonds, do you have anything further?

10        **MR. EDMONDS:**  Just some comments on what -- on what

11   defense counsel mentioned, Mr. Barsky.

12        In respect to the issue of video game, our view is that

13   this has to be a video game because you're just -- you have to

14   display something in the game environment, and you have to

15   incorporate the game object in the game environment.  The only

16   way that can logically be done is with a video game.

17        Even if the Court doesn't find that that's not -- I heard

18   Counsel say that that was somehow the linchpin of our position,

19   and if that fell, then everything else fell.  That's -- it's

20   not.  I think our position is still strong even if the Court

21   decided video game is not required because the question about a

22   computer is whether the computer is necessary to effectuate the

23   invention, not whether it's a video game, is that the ultimate

24   question for the Court.

25        Secondly, Claim 2 was pointed to as somehow establishing

1   as a matter of law that a video -- Claim 1 must be broader than

2   a video game.  When you look at Claim 2, that's -- it was an

3   oversimplification of the claim.  It says "comprised of a video

4   game that generates a series of background images and at least

5   one selected game object as directed to act in accordance with

6   the gaming action of a user," et cetera, et cetera.  There are

7   more limitations to it.

8       So it's not a situation where you have a limitation --

9           THE COURT:  So it's not Claim 2 is the video claim and

10  Claim 1 therefore must be broader than video?

11          MR. EDMONDS:  Right.  It's not -- it's not that

12  simple.  It's the claim.

13          THE COURT:  Okay.

14          MR. EDMONDS:  It has further limitations.  So you

15  can't draw that conclusion.

16      In addition, I think it points out certainly an issue.  I

17  certainly read their motion as directed to Claim 1 and -- fair

18  enough -- 15 and 17.  You know, if -- to the extent you're

19  going to rule on this and if you do rule against us, I think

20  you still need to look at, for example, Claims 2 and 3, which

21  clearly, I think, indisputably would be drawn to video game if

22  the Court thinks that distinction is significant.

23      We certainly think that a video game certainly bolsters

24  the notion that this can't be done by hand and head and a

25  computer is necessary to effectuate the invention, and in

1    particular, Claim 2 does comprise of video game and other

2    things.

3        Claim 3 comprises a plurality of player images and

4    background images, and Claim 4 also has where you have

5    background images selected from a group comprising various

6    things.  So I think it would be hard to dispute that those at

7    least aren't drawn to a video game.

8        As to the other points made, in terms of the spec -- and

9    maybe ten times in the spec it talked about you didn't need a

10   computer or have it partially computerized.  I think it goes to

11   the Court's question of "What significance should I attach to

12   the prosecution history?"  And the fact of the matter is -- and

13   I think it's really not reasonably disputable -- that there was

14   a broad disclosure in the specification of various things.

15       The patentee initially tried to claim those things.  He

16   was unsuccessful, and the claims were narrowed, and I think

17   that all the case law points the Court squarely to you need to

18   look at the claims in terms of the 101 analysis and not to

19   unclaimed subject matter in the specification that somebody

20   tried to claim early in the prosecution, was unsuccessful in

21   claiming it because it was too broad or because -- even if the

22   Court --

23           THE COURT:  So the golf analogy I can ignore because

24   the final claims were narrowed?

25           MR. EDMONDS:  Absolutely narrowed, right.  Right.

1          So these ideas that the patentee had about things like

2    golf and traffic tickets -- they're just simply -- ultimately

3    did not make the final claims, and so the claims would be --

4    would be viewed in terms of what the claim language is.

5          There was a statement that it's just not an improvement in

6    computer technology.  You know, I think, again, the Court asked

7    the question "What significance should I attach to the

8    prosecution history?" because it's a limited record before the

9    Court.  We're on a motion to dismiss.

10         Again, the prior art of record and the reasons for

11   allowance expressed by the Examiner express the Examiner's view

12   that it's an improvement on technology.  It's not -- if this

13   was one where you had a first office action allowance, we

14   didn't have any guidance from the PTO, no prior art was cited,

15   and the Court's just left in a vacuum, you say, you know, "I

16   don't know what the" -- "what the technology was.  I don't know

17   whether it's an improvement or not."

18         But here there's some very explicit statements as to what

19   the state of the art was and how this is an improvement in that

20   technology as the applicant successfully argued and convinced

21   the Examiner as expressed in the notice of allowance.

22         Lastly, there was a question about preemption.  I'll point

23   out in their reply brief they made an argument that -- that

24   preemption doesn't really mean preemption, it just means --

25   "mostly preempt" is how I paraphrase it.

1          I don't think that's what the case law requires.  I think

2     what the case law says -- and maybe there's quoting some dicta

3     in *Mayo* or what have you, but elsewhere in *Mayo* and every other

4     case I've seen, it says does the abstract -- does the claim

5     preempt all applications of the abstract idea.

6          And I think the Court, as we've had this discussion, has

7     focused on that, and I think that's a proper -- one of the

8     areas the Court really should focus on because as we pointed

9     out here today and also in our briefing, there are many

10    applications of -- of a game and many applications of a game in

11    which a purchase is made and many applications of a game even

12    when a purchase is made without interrupting it that you can

13    have that are not preempted by these claims because of these

14    other limitations.

15          **THE COURT:**  Well, I think Mr. Barsky's point was when

16    you're looking at the scope of preemption, the case law stands

17    for the proposition that it does not have to be complete

18    preemption.  In other words, you know, you don't -- you -- in

19    the absence of complete preemption, that doesn't get you out

20    from under necessarily.

21          **MR. EDMONDS:**  I think what the argument as I interpret

22    it was -- for example, if I -- if I patented an algorithm and I

23    limit it to a field of use of vulcanizing rubber, I can say,

24    "Well, gee, I haven't preempted this algorithm.  You can use it

25    for whatever you want as long as you're not vulcanizing

 1    rubber."

 2              **THE COURT:**  Right.

 3              **MR. EDMONDS:**  That's different here in the sense that

 4    this is something that's clearly applied to games.  We're

 5    talking about games.  The prior art has to do with games, the

 6    claims have to do with games, and the question for the Court is

 7    the abstract idea as you articulate it -- if you articulate it

 8    that way, does that preempt the applications of it?  And it

 9    does not.

10         And that's different than the field of use limitation in

11    gaming.  That has to do with the look to the other claim

12    limitations which provide meaningful limitations beyond the

13    abstract idea, which we respectfully submit are there.

14              **THE COURT:**  Very well.

15         Anything further?

16              **MR. BARSKY:**  Very briefly, Your Honor.

17              **THE COURT:**  Okay.

18              **MR. BARSKY:**  First, I just want to make clear that

19    it's not our argument that Claim 1, 15, and 17 would read on a

20    golf game in the real world without a computer.  Clearly, it

21    wouldn't because each of those claims requires the use of a

22    computer to manage the game.

23         Our point was really in response to what is clearly the

24    jurisprudence of the Federal Circuit that when looking at a

25    claim that somehow the addition of a computer-aided process or

1  a computer-implemented process salvages an otherwise abstract

2  idea from Section 101 ineligibility, that you take away the

3  computer and look at what's left.

4      And that was -- that is our point with respect to the golf

5  example and the mulligan example in our papers.  That's Number

6  1.

7      Second, with respect to the scope of Claims 1 and 2 --

8          **THE COURT:**  Right.

9          **MR. BARSKY:**  -- Mr. Edmonds is certainly right that

10  there's more in Claim 2 as far as additional limitations than

11  simply the addition of the game environment comprising a video

12  game, but what Claim 2 clearly says is that the gaming

13  environment comprises a video game and goes on to characterize

14  that video game.

15      If the gaming environment of Claim 1 comprised a video

16  game or was a video game, then it would be superfluous to say

17  that in Claim 2.  And of course, as Your Honor knows from the

18  rules of claim construction, we don't read claims in such a way

19  as to render claim terms superfluous.

20      So unless the Court has any questions at this point, I'll

21  just thank the Court for its time.

22          **THE COURT:**  Very well.  Thank you.

23      I will take the matter under submission and review the

24  arguments and get you an order.

25          **MR. BARSKY:**  Thank you, Your Honor.

1          **THE COURT:**  Thank you.

2               (Proceedings adjourned at 2:21 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Monday, May 5, 2014

8

9

10

11    _____

12          James C. Pence, RMR, CRR, CSR No. 13059
                    U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25